# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 3, 2013

## GREGORY TYRONE GREER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-12-101     Donald H. Allen, Judge**

**No. W2013-00626-CCA-R3-PC  - Filed December 26, 2013**

Gregory Tyrone Greer ("the Petitioner") was convicted of reckless aggravated assault by a Madison County jury.  The Petitioner subsequently filed for post-conviction relief, alleging ineffective assistance of counsel.  Following a hearing, the post-conviction court denied relief.  The Petitioner now appeals.  Upon our thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Gregory Tyrone Greer.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

Following his conviction for reckless aggravated assault, the Petitioner was sentenced to twelve years in the Tennessee Department of Correction.  In his direct appeal, the Petitioner alleged that the evidence was not sufficient to support his conviction.  See State v. Gregory Tyrone Greer, No. W2010-0536-CCA-R3-CD, 2011 WL 3556968, at *1 (Tenn. Crim. App. Aug. 9, 2011).  In the direct appeal, this Court denied relief and affirmed the Petitioner's conviction.  Id. at *4.  To assist in the resolution of this proceeding, we repeat

here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

The [Petitioner]'s conviction arose from an August 25, 2009 argument with the victim, Jolanda Stovall. The victim testified that she was living with her sister, Tameka Brawner, in an apartment directly above an apartment the [Petitioner] shared with his girlfriend, Laronda Wallace, and their children. The victim said that earlier that day, Ms. Wallace had asked the victim's friend for a ride. When the victim and her friend returned to the apartment complex sometime before school got out that day, the victim stopped at the [Petitioner]'s apartment to tell Ms. Wallace that they had returned so that Ms. Wallace could get her ride. The [Petitioner] was standing in the doorway.

The victim said that when she asked the [Petitioner] if Ms. Wallace was at home, the [Petitioner] "just clicked and went off from there." She said that as she stood on the stairway leading to her apartment, the [Petitioner] began yelling at her. He told her, "You broke bitches. She ain't got no cigarettes." The victim did not understand why the [Petitioner] would say such a thing because she had not asked for any cigarettes. She told the [Petitioner] that she "didn't know who he had a problem with, but he need[ed] to go take it up with who he had the problem with." The [Petitioner] told the victim that he "was going to take it out on [her]." At that point, the [Petitioner] and the victim began arguing "back and forth." The victim testified that the [Petitioner] was "talking crazy" and accused the victim of "begging" all the time. The victim responded that "his baby mama d[id] all the begging."

The victim went upstairs into her apartment. She could hear Ms. Wallace outside trying to calm the [Petitioner]. When the victim saw her sister and her sister's boyfriend, Jasmine Greer, walking from the parking lot to the steps, the victim went to the door. As she opened the door, the [Petitioner] shot her in the left arm. She testified that she heard two shots before being hit. She grabbed a sweater to control the bleeding from her arm, and looked outside. She saw the [Petitioner] and Ms. Wallace running through a field.

Two friends from the apartment complex gave the victim a ride to the hospital where she was treated and released. Sometime before Christmas, the victim underwent surgery to remove the bullet lodged in her arm. She reported that she had no residual effects from the wound.

On cross-examination, the victim testified that she did not telephone the police but that a neighbor, Sumayyah Casey, telephoned the police to report the shooting. The victim denied hearing either her sister or Jasmine Greer arguing with the [Petitioner]. She said she opened the door when she heard people yelling that the [Petitioner] had a gun because she feared that her nieces and nephews, who were with her sister, would be harmed. Although her statement to police indicated that she had only heard one shot, the victim affirmed that she actually heard two shots. She also explained that her statement to police erroneously stated that she was entering her apartment when shot. She affirmed that she was opening the door from inside the apartment. The victim denied threatening to "blow [the Petitioner's] brains out." She also said that neither she nor Jasmine Greer had a gun during the argument.

Tameka Brawner, the victim's sister, testified that she arrived home with her children and boyfriend at approximately 4:00 p.m. on August 25, 2009. As she pulled into the parking lot, she saw her sister, Ms. Stovall, and the [Petitioner] arguing. Not wanting any trouble that might jeopardize her keeping the apartment, Ms. Brawner told the victim to stop arguing and go inside the apartment. Ms. Brawner said that she got her children and the victim safely inside the apartment as the [Petitioner] began to argue with her. She recalled Ms. Wallace trying to pull the [Petitioner] away from the argument. Ms. Brawner saw that the [Petitioner] had his hand in his pants pocket, and she yelled for her children to go to the neighbor's apartment. Suddenly, Ms. Brawner heard three gunshots. She saw the [Petitioner] with a handgun. Ms. Brawner said that recently she had been injured in a shooting and "just froze." Ms. Casey, her neighbor, pulled her into Ms. Casey's apartment.

After the shooting ended, Ms. Brawner entered her apartment to find blood everywhere and bullet holes in her kitchen. She feared one of her children had been shot but soon learned that the victim had been shot in the upper left arm. Ms. Brawner and the victim ran to the parking lot, flagged down a car, and asked for a ride to the hospital. On their way to the hospital, Ms. Brawner saw the police, jumped out of the car she was traveling in, and got in the police car to direct them to the crime scene.

Samayyah Casey, Ms. Brawner's neighbor, testified that she and the victim arrived at the apartment complex separately but at approximately the same time on the afternoon of August 25, 2009. As they walked up the stairway to their respective apartments, the [Petitioner] and the victim began

"cussing each other." Ms. Casey, said that she was "just kind of being nosey and looking" so she stayed on the stairway landing outside her apartment to watch the argument. She remembered hearing the [Petitioner] refer to the victim and others as "begging bitches."

Ms. Casey recalled that Ms. Wallace was outside trying to calm the [Petitioner] when Ms. Brawner arrived home with her children. Ms. Brawner ushered the children and the victim inside the apartment and then came outside to see what the argument was about. The [Petitioner] "kind of pushed" Ms. Brawner and continued to threaten to "kick [the victim's] ass." The [Petitioner] initially refused the leave the stairway despite Ms. Wallace's attempts to calm him. Eventually, he returned to his chair near the doorway of his apartment and mumbled, "F——all these bitches. F——all you whores." Ms. Brawner's boyfriend walked onto the stairway landing and told her to come inside because he thought "something [was] wrong" with the [Petitioner]. Soon thereafter, the shooting began.

Ms. Casey said that she pulled Ms. Brawner into her apartment for safety. Ms. Casey saw the [Petitioner] with a handgun, and she heard at least three shots. Ms. Casey said that the victim would not have gotten shot had she not opened the door. As soon as the shooting ended, the [Petitioner] "took off running." When the police arrived, Ms. Casey gave a statement. She learned later that day that the [Petitioner] had been arrested. Ms. Casey did not hear the victim threaten the [Petitioner]. She also denied that the [Petitioner] had argued with either Ms. Brawner or Ms. Brawner's boyfriend.

Jackson Police Department Patrol Officer Ashley Robertson responded to the call of a shooting at the apartment complex at 4:20 p.m. on August 25, 2009. The police department dispatcher advised that someone had been shot and that the [Petitioner] was the perpetrator. As Officer Robertson neared the apartment complex, Ms. Brawner flagged him down and rode with him to the apartment complex. Upon their arrival, a crowd of approximately 50 people had formed at the scene. Several people reported that the [Petitioner] was inside his apartment; but, after a thorough search, the [Petitioner] could not be located. Officer Robertson observed blood inside Ms. Brawner's apartment and a bullet hole in her door. He was unable, however, to locate a weapon, shell casings, or bullets at the scene. Officer Robertson spoke to the victim at the hospital and observed the gunshot wound to her left arm.

Jackson Police Department Patrol Officer Jeffrey Wood interviewed the victim at the hospital while she received treatment for the gunshot wound to her arm. From the interview, Officer Wood understood that the victim was shot in the doorway as she entered the apartment.

Following the State's proof, the [Petitioner] elected not to testify. Based upon the foregoing evidence, the jury acquitted the [Petitioner] of attempted first degree murder as charged in count one of the indictment and convicted the [Petitioner] of reckless aggravated assault, a lesser offense of aggravated assault as charged in count two of the indictment. At sentencing, the parties agreed that the [Petitioner] qualified for sentencing as a career offender. Accordingly, the trial court sentenced the [Petitioner] to serve 12 years in the Tennessee Department of Correction.

Id. at *1-3 (citation omitted).

Concluding that the evidence was sufficient to support his conviction, this Court affirmed the judgment of the trial court. Id. at *4. Subsequently, the Petitioner filed a petition for post-conviction relief alleging that he received ineffective assistance of counsel.

The Petitioner testified at the post-conviction hearing that he wanted to call Virginia Goff as a witness in his trial and asked his counsel at trial ("Trial Counsel") to subpoena her, but Trial Counsel did not do so. According to the Petitioner, "[Goff] would have testified that the police fabricated the facts in her statement reporting that I told her I was running because I had shot somebody and that I wasn't supposed to be around guns and she said she did not state that in her statement."[1]

The Petitioner also testified that he asked Trial Counsel to call Jasmine Greer as a witness, but Jasmine Greer was never subpoenaed. According to the Petitioner,

[Jasmine Greer] was at the crime scene and me and him had got [sic] to arguing. He made threats to shoot me and pulled a gun up and he fired a shot too and I was shooting. He could have been the one who accidently shot the victim. I don't know if he would have told it like that, but he was there and that's what happened.[2]

---

[1] The Petitioner did not call Goff to testify at the post-conviction hearing.

[2] The Petitioner did not call Jasmine Greer to testify at the post-conviction hearing.

The Petitioner next testified that he "wanted to get on the stand and testify and tell [his] side of the story." However, the Petitioner testified, "[Trial Counsel] told me that it wouldn't be a good idea for me to get on the stand because the [State] would bring up my priors and that he would probably chew me up on the stand." The Petitioner clarified that he had prior felony convictions, including convictions for burglary, escape, and aggravated assault. He stated that the ultimate reason he did not testify was "because [Trial Counsel] was my lawyer and I just took his advice and didn't get up there." Had he testified, the Petitioner's story would have been that he was protecting himself from Jasmine Greer.

Finally, the Petitioner testified that Trial Counsel "failed to investigate the crime scene." According to the Petitioner, "It [sic] was a lot of witnesses that was [sic] there and they maybe probably could have told [Trial Counsel] the truth of what really went on to help in my case." He could not name any specific witnesses, "but there were a lot of people out there that day that lived over there in the apartments that [Trial Counsel] could have went [sic] and talked to." The Petitioner surmised that, had Trial Counsel investigated the scene and uncovered such witnesses, he could have discovered that "[t]he whole thing was an accident."

On cross-examination, the Petitioner admitted that, although he wanted to call Goff for the purpose of refuting an alleged statement that she made to the police, no evidence of that statement was ever presented to the jury during trial.

He acknowledged that, at the close of the State's proof, Trial Counsel went over a document with him regarding the possibility of testifying. He signed the document and elected not to testify. He also remembered going over his decision with the trial judge. He stated, "[I]t was my decision, but not of my own free will it wasn't my decision. I was coerced into doing that saying that [sic] not to get up there."

When asked what would have been gained from Trial Counsel's investigation of the crime scene, the Petitioner responded, "I don't know exactly. I just – it would have been the right thing to do to investigate the crime scene."

Trial Counsel also testified at the hearing. He remembered going over Goff's statement with the Petitioner and speaking with her prior to trial. Trial Counsel stated that he "just didn't see any reason to have her get up there to say that the [Petitioner] didn't say anything to her." According to Trial Counsel, "I told [the Petitioner] that's how I felt, and so that was our strategy was my understanding."

Trial Counsel testified that he and the Petitioner discussed the possibility of calling Jasmine Greer. He stated that he was hesitant to call Jasmine Greer because he had

previously represented him and that "perhaps that could be a conflict and I wanted [the Petitioner] to know that I had represented him before." Regarding the substance of what Jasmine Greer's testimony might have been, Trial Counsel stated:

[F]rom everything I had learned about the case and what was brought out at trial was . . . [Jasmine Greer] did not have a gun. . . . Jasmine Greer did not have a gun. There was nobody to state that other than [the Petitioner]. The two witnesses who testified for the State both said that Mr. Jasmine Greer did not have a gun.

Trial Counsel remembered that the trial court gave him "a lot of time" to talk with the Petitioner about the possibility of testifying, saying, "[W]e may have talked for almost half an hour about whether or not he wanted to testify." Trial Counsel testified that "the biggest con was that he had a very extensive felony record and most of those convictions would have come in."

Regarding his investigation of the crime scene, Trial Counsel remembered asking the Petitioner if he should contact any other witnesses, but the Petitioner did not know of any other witnesses that would have provided relevant information about the case.

On cross-examination, Trial Counsel stated that it would not "have looked good for [the Petitioner]" if he called Jasmine Greer and "he just denied that he was there and denied even having a gun." Trial Counsel did not believe that anything Jasmine Greer could have testified to would have added to the Petitioner's case and noted that all of the testimony at trial was that Jasmine Greer was never involved.

Trial Counsel testified that the Petitioner made the decision on his own not to testify and that the ultimate decision was the Petitioner's. He did not coerce the Petitioner or threaten him in any way in this decision.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently issued an order denying relief. The Petitioner now appeals, alleging that he received ineffective assistance of counsel in that Trial Counsel: (1) failed to call favorable witnesses at trial, including Virginia Goff, Jasmine Greer, and potential witnesses that may have been discovered had Trial Counsel investigated the crime scene; and (2) improperly advised the Petitioner not to testify at trial.

## Standard of Review

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006); see Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[3] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

---

[3] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

*Failure to Call Witnesses and Investigate the Crime Scene*

The Petitioner argues that Trial Counsel was ineffective for failing to call Virginia Goff and Jasmine Greer at trial. According to the Petitioner, Goff "could have testified that the police fabricated her statement that he fled the scene because he had shot the victim." Additionally, Jasmine Greer "could have testified that he was present and [he and the Petitioner] had been arguing and [Jasmine Greer] had made threats to shoot [the Petitioner]." The Petitioner asserts that the result of this testimony would have been that "the jury could have inferred [Jasmine Greer] was the individual who really shot at the victim."

The Petitioner also asserts that Trial Counsel was ineffective for failing to investigate the crime scene prior to trial because, "had [Trial Counsel] investigated the crime scene, he would have discovered witnesses who could have told the truth, i.e. that [the Petitioner] had been threatened with a gun and the shooting was an accident."

Although the Petitioner testified about what he expected Goff and Jasmine Greer would say, he did not present either of them as witnesses at the post-conviction hearing. Likewise, the Petitioner also offered no other witness from the crime scene at the post-conviction hearing. This Court has made clear that a claim of ineffective assistance of counsel arising from the failure to call a witness must be supported by testimony from the witness at the post-conviction hearing. See, e.g., Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996); Wade v. State, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995); Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990); see also Pylant, 263 S.W.2d at 869. Without the alleged witnesses' testimony, there is no way for the post-conviction court (or this Court) to evaluate whether the absence of the testimony from trial had a prejudicial effect on the outcome. Likewise, "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony would have been if introduced by defense counsel." Black, 794 S.W.2d at 757.

We cannot speculate on whether the failure to call or discover certain witnesses prejudiced the Petitioner based merely on the Petitioner's assertions of what those witnesses "could have testified." Therefore, based on the record before us, the Petitioner has failed to show that he was prejudiced by Trial Counsel's failure to present Goff or Jasmine Greer as witnesses at trial, or by his failure to investigate the crime scene and discover potential witnesses there. Accordingly, the Petitioner is entitled to no relief on those bases.[4]

---

[4] Because we have determined that the prejudice prong has not been satisfied, we need not address whether Trial Counsel's representation was deficient in this regard. See Goad, 938 S.W.2d at 370.

*Decision Not to Testify*

The Petitioner also asserts that he "wanted to testify that he was protecting himself from [Jasmine] Greer, who had threatened him." Although he admits that he "told the [trial] court that he voluntarily waived his right to testify," he argues that he was "coerced" by Trial Counsel into not testifying. Specifically, he argues that Trial Counsel "threatened" him into not testifying "by stating that if [he] did testify, the [State] would chew [him] up on the stand based on [his] prior felony convictions."

This Court has identified several factors that inform our analysis under the circumstances in the instant case:

> The following factors tend to indicate whether the failure of a defense attorney to call the defendant to testify constitutes ineffective assistance:
>
> (1) only the victim and the defendant were present when the offense was committed;
>
> (2) only the defendant could present a "full version of [his] theory of the facts";
>
> (3) the defendant's testimony could not be impeached by prior criminal convictions;
>
> (4) the defendant could give an account of the relationship with the victims; and
>
> (5) the attorney had let in objectionable, prejudicial testimony with the intention of clarifying it with the testimony of the defendant.

Bates v. State, 973 S.W.2d 615, 636 (Tenn. Crim. App. 1997) (citing State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991)). In overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, a petitioner must show that counsel's advice not to testify constituted "unsound trial strategy." Bates, 973 S.W.2d at 636.

Although the Petitioner was the only one who could have presented his theory that he was defending himself from Jasmine Greer, none of the other factors identified by Bates are present. Most notably, the Petitioner's testimony could have been impeached by numerous prior criminal convictions. See id. Trial Counsel testified at the post-conviction hearing that

he informed the Petitioner that "the biggest con [of the Petitioner testifying] was that he had a very extensive felony record and most of those convictions would have come in." Clearly, Trial Counsel's advice that the Petitioner could be impeached with his prior felony convictions on cross-examination, should he choose to testify, falls well within "an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn, 202 S.W.3d at 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688).

Furthermore, in its order denying relief, the post-conviction court found that "the [Petitioner] was fully advised by the [trial court] and [Trial Counsel] of his right to testify" and concluded that "the [Petitioner] freely, knowingly, and voluntarily waived his right to testify at trial." We agree with the post-conviction court. At the post-conviction hearing, the Petitioner testified that, when Trial Counsel told him that it "wouldn't be a good idea" to testify, the Petitioner "just took his advice and didn't get up there." Nothing in the record suggests that Trial Counsel "threatened," "coerced," or otherwise improperly advised the Petitioner regarding his right to testify. Rather, Trial Counsel's advice was a sound trial strategy under the circumstances, and the Petitioner chose to take that advice. Therefore, the Petitioner has failed to establish that Trial Counsel's performance was deficient in this regard. Accordingly, the Petitioner is entitled to no relief on that basis.[5]

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE

---

[5] Because we have determined that the deficiency prong has not been satisfied, we need not address the prejudice prong on this issue. See Goad, 938 S.W.2d at 370.

-12-